IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JESSICA FLEMING,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )      Case No.
                                    )      14-0136-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jessica Fleming seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title II of the Social

Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in failing to find that plaintiff's

knee impairment meets the requirements of listing § 1.02 and (2) the Appeals Council erred in

failing to consider new material evidence. I find that the substantial evidence in the record as

a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion

for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.*    *BACKGROUND*

On June 21, 2010, plaintiff applied for disability benefits alleging that she had been

disabled since June 2, 2010. Plaintiff's disability stems from a knee injury. Plaintiff's

application was denied on July 21, 2010: "The medical evidence shows you are impaired, and

your activities are severely restricted at this time. However, evidence shows your condition is

improving, and additional recovery is anticipated. Within 12 months, it is expected you will

be able to do your past work as a retail supervisor." (Tr. at 89). On June 8, 2012, and

November 7, 2012, a hearing was held before an Administrative Law Judge. On November 30,

2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On

January 13, 2014, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

*III.*    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Richard Sherman, in addition to documentary evidence admitted at the hearing and submitted to the Appeals Council.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1996 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1996 | $ 3,790.94 | 2005 | $ 28,058.25 |
| 1997 | 6,083.62 | 2006 | 33,289.77 |
| 1998 | 8,056.32 | 2007 | 23,156.95 |
| 1999 | 13,528.18 | 2008 | 33,023.48 |
| 2000 | 13,249.49 | 2009 | 30,285.02 |
| 2001 | 13,624.75 | 2010 | 17,521.70 |
| 2002 | 17,339.90 | 2011 | 0.00 |
| 2003 | 15,863.43 | 2012 | 0.00 |
| 2004 | 12,557.42 | | |

(Tr. at 145-146, 152).

### Function Report

In a Function Report dated July 9, 2010, plaintiff reported her daily activities from when she was still working instead of after her alleged onset date (Tr. at 168-175). She

4

reported that she is living off her worker's compensation payments and her boyfriend's food stamps. She reported that she visits her mom and her niece, and she goes to city markets or flea markets every two to three weeks. She eats in a restaurant once a week, she goes to the movies once a month. Plaintiff said her family and friends visit her home and she goes through "10-20 min. sleeping attacks." She gets along well with others, she handles stress extremely well, she has no problems handling changes in routine.

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated July 9, 2010, plaintiff reported that her only medication was Cephalexin, an antibiotic (Tr. at 177-179). She plays video games and puzzles or uses a computer for 6 or 7 hours per day.

**B.     *SUMMARY OF TESTIMONY***

During the June 8, 2012, hearing, the ALJ discovered that plaintiff was acting pro se and had not gotten her medical records submitted to the court (Tr. at 22-41). The hearing was continued so that plaintiff's medical records could be obtained and she could explore the possibility of securing representation.

During the November 7, 2012, hearing, plaintiff testified; and Richard Sherman, a vocational expert, testified at the request of the ALJ. Plaintiff did not have a representative at this hearing.

> I sought out an attorney at Rubins, Case, Cambiano and Bryant, he gave me advice as far as my case was concerned and informed me that because I am on Workers' Comp and because there is a back pay, his fees would have come out of whatever Social Security back pay. And he informed me of a law that was passed saying that when it's past 125 weeks the back pay goes to Workers' Comp and that it wouldn't be feasible -- that he would, that the, the amount of money that would, it would take for me to retain his services was not going to be worth the effort. And he informed me that I had the right to come in and ask for the medical records be requested on my behalf and given the severity of the injury and the number of surgical procedures I had that I, that I did in fact qualify for disability. So I came in based off of that advice.

(Tr. at 47).

5

1.    **Plaintiff's testimony.**

Plaintiff is 5'8" tall and weighs 243 pounds (Tr. at 56).

Since plaintiff's work accident, she is able to sit with her brace on from 45 minutes to an hour and a half (Tr. at 54, 55). After sitting for about 45 minutes, plaintiff's knee locks into place and she has pain (Tr. at 54-55). Plaintiff's pain without medication is a 5 to 7 on a scale of 1 to 10 (Tr. at 55). She does not take medication -- she uses heat, ice and physical therapy stretches (Tr. at 55). Plaintiff used medication for about a year and a half but began experiencing physical and mental problems (Tr. at 55).

Plaintiff can stand for 25 to 30 minutes, then she begins to "buckle and swell" (Tr. at 55). She can walk 25 to 30 yards with a cane before she begins to "buckle out and become unstable" (Tr. at 55). Plaintiff testified, however, that she no longer uses a cane because the weight bearing on the cane sprained her wrist; she now uses crutches (Tr. at 55-56). Plaintiff can carry 11 or 12 pounds, which is the weight of her newborn (Tr. at 56). She has to take stairs one step at a time while using a crutch and holding onto the rail (Tr. at 57). Plaintiff has poor balance -- she can stand to take a shower or put on socks, but if she tries to walk on unlevel ground or move to the side or back up, her pain becomes excruciating (Tr. at 57). She can take a bath by using her good leg to lower herself and lift herself up (Tr. at 57). Plaintiff stays seated to get dressed (Tr. at 57). She has a driver's license and uses her boyfriend's car to drive places two or three times a month (Tr. at 58). She can go to the neighborhood grocery store by herself and she braces herself on the grocery cart and one crutch (Tr. at 58). When plaintiff was seeing the doctor at Truman Medical Center when she was pregnant, she would have her boyfriend drop her off at the door (Tr. at 59). If she was not able to have someone drop her off, she would have to get there 45 minutes before her appointment to leave time to get from the parking lot to the doctor's office, which required her to walk "clear across the

hospital" (Tr. at 59).

Plaintiff cashes her worker's compensation check on Tuesdays and goes grocery shopping and does her other errands the same day so she can get everything done at once (Tr. at 59-60). She bathes her baby while sitting on the bed (Tr. at 60). She testified that she uses a sling to carry her baby, but then she testified that she was told not to use the sling because she has to use crutches (Tr. at 60). Plaintiff never moves while carrying her baby: "Since he's been born there has been one time where I was unable to keep from maneuvering him from my front room to my bedroom and I actually buckled out and we both almost hit the doorframe of my kitchen door so I don't do anything with him up." (Tr. at 60).

Throughout her pregnancy, plaintiff had to be monitored for heart murmurs (Tr. at 61). She was told her heart problems were either caused by anxiety or from pressure from walking with the crutches (Tr. at 61). She was diagnosed with clinical depression in June 2012 (Tr. at 62). Plaintiff was prescribed Zoloft and Prozac but she has chosen to take neither (Tr. at 62). Plaintiff has a lot of trouble sleeping due to pain in her leg (Tr. at 62). Plaintiff tried to do aquatic aerobics for her knee and it felt better while she was in the water but she had to be lifted out (Tr. at 62-63).

Plaintiff's baby wakes up twice a night (Tr. at 63). Plaintiff gets up at 6:15 to prepare breakfast for her five-year-old (Tr. at 63). Throughout the day every two to three hours, she puts a heating pad on her knee and massages the area (Tr. at 65). She also does a lot of stretches throughout the day (Tr. at 65). Plaintiff either lies down or elevates her leg for 35 to 55 minutes at a time six or seven times a day (Tr. at 67).

## 2. Vocational expert testimony.

Vocational expert Richard Sherman testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes fast food worker, unskilled, light exertion; sales

7

clerk, semi-skilled; light exertion; and hospital food service worker, unskilled, medium exertion (Tr. at 65-66).

The first hypothetical involved a person 30 years of age with an 11th grade education who is limited to light work with only occasional pushing or pulling bilaterally; can stand or walk for six hours a day; can sit for six hours per day; would require a sit/stand option to change and adjust positions at will; could only occasionally balance, stoop, bend and climb stairs or ramps; would need assistance climbing stairs and ramps; and would never be able to climb ladders scaffold or ropes (Tr. at 66). Such a person could not perform any of plaintiff's past relevant work (Tr. at 66). The person could, however, work as a small parts assembler, DOT 706.684-022, with 8,600 jobs in Missouri and 345,000 in the country, or an office helper, DOT 239.567-010, with 5,800 in Missouri and 139,200 in the country (Tr. at 66-67). These positions are unskilled and require only limited education to perform (Tr. at 69). They require only on-the-job training for less than 30 days (Tr. at 69).

The second hypothetical was the same as the first except the person would be required to use either a cane, a single crutch or two crutches (Tr. at 67). The vocational expert testified that such a person could still perform the jobs of small parts assembler and office helper (Tr. at 67).

The third hypothetical involved a person who would need to elevate her leg or lie down for 35 to 55 minutes at least six or seven times a day (Tr. at 68). Such a person could not work (Tr. at 68).

## C.      SUMMARY OF MEDICAL RECORDS

On June 3, 2010, plaintiff went to St. Joseph Medical Center after suffering a work injury when doors fell on her leg (Tr. at 270-287). Scott Abraham, M.D., an orthopaedic

surgeon, performed Open Reduction and Internal Fixation (ORIF)[1] surgery to repair a left bicondylar tibial plateau fracture (Tr. at 247-249, 369-371).



Dr. Abraham described plaintiff's fracture as a "combination of a Schatzker 3 and a Schatzker 4 fracture." Plaintiff tolerated the procedure well.  She remained in the hospital until her discharge on June 8, 2010.  On the day of her discharge, she was able to ambulate with a walker and navigate stairs (Tr. at 273).  While in the hospital, plaintiff had muscle spasms in both legs which were treated with Flexeril (muscle relaxer) and Ativan (anti-anxiety).  Plaintiff was discharged with a prescription for Percocet (narcotic) for pain and Lovenox (blood thinner) to reduce the risk of blood clots.



On June 18, 2010, plaintiff saw Dr. Abraham for post operative examination (Tr. at 244-246, 366-368).  Her pain was controlled with Percocet (narcotic).  Plaintiff denied

---

[1]An open reduction and internal fixation (ORIF) is a type of surgery used to fix broken bones. This is a two-part surgery. First, the broken bone is reduced or put back into place. Next, an internal fixation device is placed on the bone.  This can be done with screws, plates, rods, or pins that are used to hold the broken bone together.

fatigue, palpitations, joint swelling, joint pain, muscle aches, stiffness, muscle cramps, arthritis, loss of strength, poor balance, disturbances in coordination, numbness, falling down, weakness, fainting, anxiety and depression. Her left knee range of motion was 80 degrees. X-rays were obtained and showed hardware in good position. She was told to use crutches as needed and to "really work on her flexion." Physical therapy was recommended (Tr. at 255). Plaintiff's staples were removed and she was told to return in two weeks. She continued to be off work.

On June 21, 2010, plaintiff applied for disability benefits.

On July 2, 2010, plaintiff saw Dr. Abraham for a follow up (Tr. at 242-243, 363-364). "Pain is getting better every day." Plaintiff said the pain was improving but she complained of swelling. Plaintiff was taking Percocet (narcotic). Plaintiff's knee flexion was 90 degrees. Steri-strips were removed. X-rays were obtained and showed stable hardware with no signs of loosening.

On July 8, 2010, plaintiff saw Dr. Abraham for a follow up (Tr. at 241, 362). She continued to be non-weight bearing, was attending formal therapy, and was doing home exercises. Plaintiff was taking Percocet (narcotic) and Dr. Abraham prescribed Keflex (also known as Cephalexin, an antibiotic) to be taken over the next seven days. Dr. Abraham removed the exposed sutures and told her to return in one week.

On July 15, 2010, plaintiff saw Dr. Abraham for a wound check (Tr. at 361). Plaintiff remained non-weight bearing. Plaintiff had been in physical therapy. He told her to continue physical therapy, he approved pool therapy, and he told her to return in six weeks.

On August 30, 2010, plaintiff saw Dr. Abraham for a follow up (Tr. at 359-360). Plaintiff had continued to wear the immobilizer as directed, she had been non-weight bearing. Her pain had improved. "Really needs to work on quad strength." He kept her off work and

told her to return in four weeks.

On September 27, 2010, plaintiff saw Dr. Abraham for a follow up (Tr at 356-357). Plaintiff had been partial weight bearing, using a walker for ambulation assistance. She was attending formal therapy and participating in a home exercise program. She was taking pain medication only with physical therapy. "No other complaints." Dr. Abraham recommended that plaintiff progress to weight bearing as tolerated under the supervision of her physical therapist. He refilled her hydrocodone. "She has done well with PT and hopefully will continue to progress. Return to office in 6 weeks."

On November 8, 2010, plaintiff saw Dr. Abraham for a follow up (Tr. at 352-354). Plaintiff continued to use a cane for ambulation assistance. She was attending formal therapy and maintaining a home exercise program. She was only taking hydrocodone (narcotic) occasionally at night and before physical therapy. Dr. Abraham had x-rays taken which showed a healed tibial plateau fracture. He recommended that she try to wean herself frm the cane, return to work on light duty, and return in four weeks. He suggested she may need a work hardening[2] program if she continued to have trouble weaning herself from the cane. He released her to return to work with no prolonged standing or walking, no climbing/bending or stooping, no squatting or kneeling, sit down job only, no ladder climbing, no walking or standing greater than 30 minutes a day.

On December 6, 2010, plaintiff saw Dr. Abraham for a follow up (Tr. at 349-351). Plaintiff was using a cane for ambulation assistance and was participating in a formal therapy and home exercise program. Plaintiff was able to walk for 50 minutes without her cane but

---

[2]A highly structured, goal-oriented, individualized intervention program designed to return the employee to work. The programs are multidisciplinary in nature and utilize real or simulated work activities designed to restore physical, behavioral and vocational functions. Work Hardening addresses the issues of productivity, safety, physical tolerances and worker behaviors.

was having pain although her pain was improving.  Dr. Abraham told plaintiff to begin a work hardening program and work on weaning off the cane.  He released plaintiff to return to work with the following restrictions:  No prolonged standing or walking, no climbing/bending or stooping, no squatting or kneeling, sit down job only, no ladder climbing, no walking or standing greater than 30 minutes a day.

On January 3, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 347-348).  Plaintiff had been participating in a home exercise program, a work hardening program and physical therapy.  "Is seeing improvement in her knee. Can go 1 to 1 1/2 hrs without her cane.  Pain has been some worse secondary to the extensive therapy."  Plaintiff was told to continue her work hardening program and physical therapy.  She was released to return to light duty.

On January 31, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 343-344).  Plaintiff remained weight bearing but continued to wear an immobilizer as directed.  Her pain was worsening.  Plaintiff had been participating in a work hardening program for about six hours per day.  Plaintiff said over the past month she had experienced increased swelling after significant amounts of stretching, bending and physical therapy.  Her knee had also started "locking."  Plaintiff was ambulating without an assistive device at this time.  Dr. Abraham had x-rays taken which showed stable hardware.  "I am somewhat concerned about this intermittent swelling in her leg and given the fact that she did have some superficial wound healing difficulty in the beginning, I think we need to rule out deep infection."  Dr. Abraham ordered a CT scan and blood work.  He told her to continue work hardening and physical therapy for now.

On February 14, 2011, plaintiff had a CT scan of her left leg (Tr. at 372-373).  Matthew Caterine, M.D., found incomplete fracture healing/delayed union in the posterior and lateral tibial plateau (see photo on page 9).  He recommended comparison with outside

imaging studies to assess for interval change and, if infection was suspected, a nuclear medicine white blood cell scan for further evaluation.

On March 16, 2011, plaintiff saw Dr. Abraham to review test results (Tr. at 339-341). Plaintiff continued to be weight bearing but was using a cane for ambulation assistance. Plaintiff had stopped physical therapy per Dr. Abraham while he evaluated her for infection. "Pain has not changed since stopping PT." Plaintiff denied fatigue, palpitations, poor balance, falling down, anxiety and depression. Plaintiff's cardiac exam was normal with no murmurs. Plaintiff's test results suggested a hardware infection. "I believe that her plateau is healed based on her CT scan." Dr. Abraham recommended hardware removal and said that would require a 3- to 5-day hospital stay with IV antibiotics and a consultation with infection disease for antibiotic selection. Plaintiff would need to remain non-weight bearing for 4 to 6 weeks after surgery to protect her plateau and allow fill-in of her screw holes.

On March 21, 2011, plaintiff underwent a removal of the infected hardware of her left tibial plateau due to symptoms which caused Dr. Abraham to suspect an infection (Tr. at 310-313, 376-378). Daniel Geha, M.D., an infectious disease specialist, evaluated plaintiff at the request of Dr. Abraham (Tr. at 308-309). Plaintiff had been on no medications prior to her admission. Dr. Geha recommended intravenous antibiotic therapy.

On March 22, 2011, plaintiff had a PICC[3] line put in place (Tr. at 307). She was discharged the following day with a prescription for Lortab (narcotic) and IV antibiotic.

On March 31, 2011, plaintiff saw Dr. Geha for a post hospital plan (Tr. at 294). Plaintiff had tenderness and limited range of motion. This very short record is mostly illegible.

On April 4, 2011, plaintiff saw Dr. Abraham for her post-operative visit (Tr. at 337-

---

[3]A peripherally inserted central catheter (PICC line) is a form of intravenous access that can be used for a prolonged period of time.

338). Plaintiff continued to be non-weight bearing and was using a walker for ambulation assistance. Staples were removed and steri-strips were applied. He continued plaintiff on antibiotics per Dr. Geha, told her to remain non-weight bearing for the next four weeks and begin physical therapy.

On April 5, 2011, plaintiff was assessed with cellulitis [bacterial skin infection] on her leg and was prescribed an antibiotic (Tr. at 298).

On April 11, 2011, plaintiff saw Dr. Geha (Tr. at 293). The record is very short and mostly illegible, but it does state that her knee is less tender with less swelling.

On May 2, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 335-336). Plaintiff remained non-weight bearing and was using crutches for ambulation. Dr. Geha had released plaintiff from his care about three weeks earlier. Dr. Abraham recommended that plaintiff begin weight bearing as tolerated, continue with physical therapy, and return in six weeks.

On May 27, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 333-334). Plaintiff was partial weight bearing but was using crutches for ambulation assistance. Plaintiff said physical therapy was helping, that she was using two crutches but was hoping to transition to one in the next week or so. Dr. Abraham ordered x-rays and indicated he would discuss plaintiff's case with her case manager and the physical therapist.

On June 27, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 330-331). Plaintiff was weight bearing but was using crutches for ambulation assistance. She was attending formal therapy and maintaining her home exercise program. Dr. Abraham had spoken with plaintiff's physical therapist who felt not much progress was being made. Plaintiff could not walk without an assistive device and could only walk a maximum of 90 feet before the pain was too bad. Dr. Abraham ordered an MRI to evaluate the joint stability.

On June 29, 2011, plaintiff had an MRI of her left knee (Tr. at 378-379).

14

On July 13, 2011, plaintiff saw Dr. Abraham to go over test results (Tr. at 327-328). Plaintiff was weight bearing but used a cane for ambulation assistance. She was attending formal therapy and had a home exercise program. Flexion was 130 degrees. Plaintiff's MRI showed irregularity of the articular surface of her lateral tibial plateau (see photo on page 9) and some questionable cortical and cancellous bone[4] in the posterolateral plateau.



Everything else was normal. Plaintiff had gotten maximum benefit from her physical therapy. Dr. Abraham recommended a CT scan to further evaluate plaintiff's lateral tibial plateau. "It appears that she may be heading towards posttraumatic arthritis and this may be a very difficult situation to treat especially given her young age."

On July 26, 2011, plaintiff had a CT scan of her left knee (Tr. at 380-381).

On August 4, 2011, plaintiff saw Dr. Abraham to go over test results (Tr. at 324-326). Plaintiff's pain was the same, and she continued to use one crutch for ambulation. Her gait was antalgic but she had no deformity. Range of motion was 130 degrees (normal is 155). Dr. Abraham told plaintiff he would send her scans to Dr. Tilley at KU Medical Center for a recommendation. "Question if she may need a reconstructive procedure for articular cartilage. We also discussed the possibility that there may be nothing that can be done."

On September 8, 2011, plaintiff saw Dr. Abraham for a follow up (Tr. at 320-323). "Only able to be on her leg about 2 hours at a time. Continues to need at least 1 crutch and

---

[4]Cortical bone is the dense outer surface of bone that forms a protective layer around the internal cavity. Cancellous bone is the meshwork of spongy tissue of mature adult bone.

sometimes 2." Plaintiff weighed 240 pounds. She denied fatigue, palpitations, poor balance, falling down, anxiety and depression. Her cardiac exam was normal with no murmurs. She had an antalgic gait and a valgus deformity (knock-kneed). She was able to flex 130 degrees (normal is 155) with her left knee. "I sent Ms. Fleming's records to Dr. Michael Tilley at KU Medical Center for his review. He is a fellowship trained orthopedic trauma surgeon. After discussion with Dr. Tilley several points were made. First he feels the CT scan shows there potentially is healing of her fracture. According to the MRI scan, her menisci appear to be intact as well as her ligamentous structures. About the only thing that he could offer or would offer would be possibly a diagnostic arthroscopy to assess her articular cartilage. He does not feel that any sort of osteotomy[5] for malunion is appropriate at this time given his assessment of the films." Dr. Abraham recommended arthroscopy to



see if there was anything that could be causing plaintiff's pain but not showing up on the MRI. She agreed to proceed.

On October 14, 2011, plaintiff saw Stanley Bowling, M.D., at Dickson-Diveley Midwest Ortho for a second opinion (Tr. at 289-291). Plaintiff's weight was 234 pounds. On exam, plaintiff's left knee was "grossly

---

[5]"Knee osteotomy is a surgical procedure that may be recommended if you have arthritis damage in just one area of your knee. The procedure involves removing or adding a wedge of bone to your upper shinbone (tibia) or lower thighbone (femur) to help shift your body weight off the damaged portion of your knee joint. Knee osteotomy is most commonly performed on people who may be considered too young for a total knee replacement. Total knee replacements wear out much more quickly in people younger than 55 than in people older than 70. Many people who undergo knee osteotomy will eventually need a total knee replacement — usually about 10 to 15 years after the knee osteotomy." http://www.mayoclinic.org/tests-procedures/knee-osteotomy/basics/definition/prc-200190 23

16

unstable." Her range of motion was 110 and she had tenderness to palpation around the knee joint. She was walking with the use of a crutch. Her medial and lateral incisions had healed very nicely. X-rays were taken and revealed overall good alignment of the tibial plateau. She had some joint space narrowing and early degenerative changes. "At this point I think the only work ability she would have would be sedentary work only. It is my opinion that her slow progress to date results directly from her gross instability of her knee. I also think that her cartilage injury of her knee is also symptomatic but she would maybe benefit from a knee arthroscopy[6] with debridement.[7] I also feel that in order to give her some relief of her instability she would benefit from a custom brace built specifically for her. . . . This prevents hyperextension [bending forward] and protects her from varus and valgus stressing. She would need this for her lifetime. . . . I feel in her lifetime she will require a knee replacement."



On November 7, 2011, plaintiff saw Dr. Abraham (Tr. at 317-319). Plaintiff continued to have knee pain. She was using two crutches and had not been in physical therapy. She weighed 240 pounds. Plaintiff denied fatigue, palpitations, anxiety and depression. Her

---

[6]Arthroscopy is a procedure for diagnosing and treating joint problems. During arthroscopy, a surgeon inserts a narrow tube containing a fiber-optic video camera through a small incision -- about the size of a buttonhole. The view inside the joint is transmitted to a video monitor. Arthroscopy allows the surgeon to see inside the joint without having to make a large incision. Surgeons can even repair some types of joint damage during arthroscopy, with pencil-thin surgical instruments inserted through additional small incisions.

[7]Debridement consists of smoothing rough edges and removing torn menisci (the cartilage between the upper bone, or femur, and lower bone, or tibia), shaving tibial ostophytes (bone spurs, or bony projections) and removing loose bodies that interfere with the motion of the joint.

17

cardiac exam was normal including normal heart sounds, normal rate and rhythm, and no murmurs. She had an antalgic gait. Her flexion was 130 degrees on her left knee (normal is 155). "I had a long discussion today with Jessica regarding treatment options. We talked in the past about knee arthroscopy and she wants to proceed with this. We discussed the fact that this will be for diagnostic arthroscopy with possible chondroplasty[8] vs. possible microfracture[9] if needed. We also discussed the fact that there may be nothing that we may be able to do arthroscopically for her knee. This certainly is a difficult situation as her bone is healed but she continues to have pain in her knee. We will plan to return her to physical therapy after her arthroscopy to see if we can get her off her crutches. In addition, Jessica informed me today that she is 2 weeks late on her period and there is a question if she may be pregnant or not. She is going to take a home pregnancy test and follow up with us regarding this issue."

On December 27, 2011, plaintiff was seen at her OB/GYN clinic (Tr. at 617-625, 678-686).

On January 10, 2012, plaintiff saw Tara Chettiar, M.D., an obstetrician/gynecologist (Tr. at 198, 626-631, 677). Plaintiff had questions about a plan for diagnostic arthroscopy of her left knee. Dr. Chettiar recommended that plaintiff wait until six weeks after giving birth, due to the risk of deep venous thrombosis (blood clots in the legs) after surgery and immobility due to knee surgery. Plaintiff was assessed with left knee crush injury; possible heart murmur/arrhythmia, although her EKG was normal and no heart murmur was audible; and

---

[8]This outpatient procedure is used to repair a small area of damaged cartilage in the knee. The damaged tissue is removed, allowing healthy cartilage to grow in its place. It is performed through small incisions on the sides of the knee with the aid of a small video camera called an arthroscope.

[9]Microfracture is a surgical technique that has been developed to treat chondral defects, which are damaged areas of articular cartilage of the knee. It is a common procedure used to treat patients with full thickness damage to the articular cartilage that goes all the way down to the bone.

obesity.

On January 31, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 676). "Pt has no complaints. . . . Doing well no problems." This record was provided by plaintiff's counsel to the Appeals Council and was not before the ALJ.

On February 21, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 632-636, 675). Plaintiff reported a 15-year history of migraines as well as headache with blurry vision over the past two weeks. She was told to take Tylenol for headaches.

On March 12, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 638-641, 674).

On April 2, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 532-533, 642-645). Plaintiff reported dizzy spells consisting of hot flashes and palpitations with blurry vision. "Has 'blacked out' once before while sitting but has not fallen and has not lost consciousness with other episodes.'" The records show that plaintiff had cardiac arrhythmia not otherwise specified with an onset date of December 27, 2011. She was referred for a cardiac consult.

On April 16, 2012, plaintiff saw M. Jarved Ashraf, M.D., a cardiologist (Tr. at 595-597, 663-667). Plaintiff has reported six syncopal episodes in the past two months. Plaintiff described them as hot flashes, dizziness, and a racing heart. She would make her way to the bed and lie down, after which she would black out. "The last episode was on April 12, 2012 while standing. She was in the heavy parking lot after getting groceries and she blacked out. She was resuscitated by EMS." Plaintiff reported having episodes of palpitations and dizziness (but not together) over the past two years. Plaintiff reported having had significant anxiety since her accident in June 2010. Physical exam showed regular rate and rhythm with normal heart sounds. "There is a 1/6 flow murmur at the right upper sternal border." An EKG was normal (Tr. at 615-616). She was assessed with syncope, etiology unknown, and palpitations.

Dr. Ashraf recommended a 30-day event monitor[10] and an echocardiogram. Plaintiff's echocardiogram was normal (Tr. at 597, 610-613, 659-662).

On April 20, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 534-540, 673).

On May 7, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 541-546, 672).

On May 29, 2012, plaintiff saw Dr. Ashraf for a follow up (Tr. at 602, 605-606, 655-658). Plaintiff reported that her syncope was improving with hydration. The results of the event monitor showed "eight recordings available for analysis. The patient's symptoms of fatigue, headache, chest pressure, palpitations, dizziness, and heart pounding are not associated with any arrhythmias." Dr. Ashraf noted that plaintiff's cardiac symptoms "do not appear to correlate with any arrhythmias." The event monitor showed "no evidence of concerning causes of syncope (arrhythmias, structural heart disease, etc.). Cardiology will sign off." (Tr. at 602). Dr. Ashraf recommended plaintiff drink more water and give herself one to two minutes between sitting and standing or lying and sitting.

On June 4, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 547-553, 671). Plaintiff complained of depression and symptoms of anxiety. Because her Holter monitor, echocardiogram and EKG were all normal, her palpitations were determined to be stress related. She was offered Prozac for depression, and postpartum depression was discussed.

On June 8, 2012, plaintiff's first administrative hearing was held but was continued so that additional medical records could be obtained and plaintiff could explore the ALJ's

---

[10]Cardiac Event Monitoring is a medically prescribed, non-invasive procedure that is conducted on patients who report symptoms that may be cardiac in origin, and that occur infrequently-usually three times or less in one week. The term "Event Monitoring" is used because traditionally the test relied on the occurrence of symptoms, or "events"; that is, the patient activated the Event Monitor to record his/her ECG when symptoms occur. Medicomp monitors also have the ability to auto-capture events even if the patient does not feel the symptom to initiate the recording. The testing period can last up to 30 days, which means that the patient carries the Event Monitor for this length of time.

recommendation that she obtain the assistance of counsel.

On June 13, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 554-561, 670). Plaintiff indicated that she did not want to start Prozac due to the cost. She said she had an appointment scheduled with Dr. Maldanado in a few days and wanted to talk to him before purchasing the Prozac.

On June 15, 2012, plaintiff saw Jesus Maldonado-Duran, M.D., a psychiatrist, due to complaints of depression and feelings of guilt (Tr. at 575-578, 650-654). "She feels exasperated with her life circumstances and she blames herself for being weak and dependent on the system." Plaintiff reported crying and feeling very pessimistic about the future.

> [T]he patient has a number of medical preoccupations and is somewhat hypochondriac it would seem. She says that she has problems with her heart, sometimes she has palpitations and she worries about that. She also worries a lot about her pain and she has had in the past some blackouts where she may have dizzy spells or become very anxious and start to lose consciousness. She wonders if she has low blood flow to the brain. The patient also has a fair amount of anxiety. . . . [S]he did not finish high school and left in the 11th grade because she wanted to party and to be with friends. She is very irritated with herself about this and blames herself [for] not doing the right thing. She is starting to lose control of her life. She has pride in herself always in being a very competent woman who does not need any help from anyone and now finds herself expecting help from her boyfriend, from her mother and other people and [this] makes her very uncomfortable. She feels like a failure. The patient has always despise[d] people who take advantage of the system and she does not want to be one of them. She feels like she should work and dwell on more things, even though her condition is fairly severe and she has had a number of operations in the knees. The patient's boyfriend has a legal history and this makes it hard for him to get a job.

Plaintiff reported occasional use of marijuana. Plaintiff was observed to have a flat affect and to be very muted in her emotional expression. Dr. Maldonado-Duran assessed major depressive disorder, recurrent, moderate. Her Axis IV stressors were noted to be severe and included "unexpected pregnancy, some conflict with her boyfriend, conflict with her mother, financial problems, unemployment, problems with access to housing, and the

21

healthcare system." Her GAF was 50.[11]  Plaintiff did not want to take medication during her pregnancy.  Dr. Maldonado-Duran offered support and told her to return in a week, and after her baby was born he would reevaluate the situation.  There is no evidence that plaintiff saw Dr. Maldonado-Duran again.

On June 20, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 562-569, 668-669).  "Having some lower left leg edema but states she has that when up on feet for too long.  Patient wearing a knee brace for support of left leg post a crush injury and prior surgeries.  Third surgery planned for 6 weeks postpartum."

Plaintiff's baby was born on June 28, 2012, without complication (Tr. at 570, 573-574, 598-602).  She was monitored by cardiology and had no abnormal sinus rhythm and no cardiac events during her hospital stay, although she reported to cardiology that she had been experiencing episodes of lightheadedness and dizziness for more than five years (Tr. at 593, 598).  Her psychiatric exam was normal including appropriate mood and affect (Tr. at 600).  She was discharged on June 30, 2012.

On August 9, 2012, plaintiff saw her cardiologist for a postpartum check up (Tr. at 607).  The records note that plaintiff tolerated childbirth well.

On August 13, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 570-572).  Postpartum depression screening revealed a depressed mood.  Plaintiff denied suicidal or homicidal ideation.  She indicated she would try to get in touch with her psychiatrist.  Although plaintiff had experienced episodes of lightheadedness during her pregnancy, she had not experienced any such episodes postpartum.

---

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On November 7, 2012, plaintiff's administrative hearing was held. On November 30, 2012, the ALJ found plaintiff not disabled.

The following records were presented to the Appeals Council and were not before the ALJ.

On December 12, 2012, plaintiff saw Dr. Abraham (Tr. at 691-694). Plaintiff was using a hinged brace and walking with two crutches. "Her pain really has been essentially the same for the past year. She does take ibuprofen on a PRN [as needed] basis for this." Plaintiff denied fatigue, blurring vision, palpitations, blackouts, fainting, headaches, poor balance, falling down, fainting, anxiety and depression. On exam plaintiff had a normal psychiatric and normal cardiac exam. X-rays were obtained which showed increased lateral compartment narrowing compared to previous x-rays. "No work until recheck." He assessed posttraumatic arthritis. He discussed arthroscopy again, as was discussed before her pregnancy. "She . . . wishes to proceed. We will schedule her for a mutually convenient time."

On January 21, 2013, plaintiff saw Dr. Abraham (Tr. at 688-690). Plaintiff was using a hinged brace and walking with two crutches. "Her pain really has been essentially the same for the past year. She does take ibuprofen on a PRN basis for this." Plaintiff weighed 240 pounds. She denied fatigue, blurring vision, palpitations racing or skipping heartbeats, blackouts, fainting, headaches poor balance, falling down, anxiety, and depression. Plaintiff's psychiatric exam was normal. Her cardiac exam was normal with no murmurs. Gait was antalgic with 130 degree flexion. X-rays were obtained which showed increased lateral compartment narrowing compared to her previous x-rays. "No work until recheck." Dr. Abraham assessed posttraumatic arthritis in the left knee. He discussed arthroscopy again, as was discussed before her pregnancy. "She . . . wishes to proceed. We will schedule her for a mutually convenient time."

This record appears to be word for word the same as the record dated December 12, 2012, even to the point of comparing previous x-rays and finding increased lateral compartment narrowing in both and noting plaintiff's decision to proceed with arthroscopy in both. It does not appear that, if plaintiff did indeed see Dr. Abraham on this date, anything but the date was changed in order to create this new record.

On February 20, 2013, Dr. Abraham completed a Physical Residual Functional Capacity Questionnaire (Tr. at 696-700). He noted that plaintiff's prognosis is poor. He noted that her treatment consists of non-steroidal anti-inflammatories on an as-needed basis with minimal side effects. When asked to identify any psychological conditions affecting plaintiff's condition, he did not check depression or anxiety. When asked how often during a typical workday is plaintiff's pain severe enough to interfere with the attention and concentration needed to perform "even simple work tasks," he checked, "occasionally" which is defined as 1/3 of the day. He found that plaintiff can walk two blocks on an even surface, she can sit for more than two hours at a time and for at least 6 hours per day, she can stand for 30 minutes at a time, she can stand or walk for less than 2 hours total per day, she needs to alternate at will from sitting to standing to walking, she needs to take unscheduled breaks twice a day for ten minutes, and she does not need to elevate her leg. When engaging in occasional standing or walking, plaintiff needs to use a cane or other assistive device. She can occasionally lift 10 pounds and rarely lift 20 to 50 pounds. She can frequently twist, occasionally stoop or climb stairs, rarely crouch or squat, and never climb ladders. Plaintiff's impairments are likely to produce good days and bad days, and plaintiff is likely to miss an average of 2 days of work per month due to her symptoms or treatment. He believed that plaintiff's pain was caused by lateral joint space narrowing shown on x-rays. Plaintiff's symptoms and limitations have been present since June 2, 2010.

24

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Raul Pardo entered his opinion on November 30, 2012 (Tr. at 10-17).  Plaintiff's last insured date was December 31, 2014 (Tr. at 12).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Step two.  Plaintiff's severe impairments include left bicondylar tibial plateau fracture status post open reduction internal fixation surgery, and obesity (Tr. at 12).  Plaintiff's depression is not a medically determinable impairment (Tr. at 13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-14).  Plaintiff was able to ambulate effectively within a few months of her initial surgery, despite her obesity (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform light work except she needs the option to alternate from sitting to standing or walking at will; she can only occasionally balance, stoop, bend, push, pull, or climb stairs or ramps; she can never climb ladders, scaffolds or ropes; and she needs the ability to use a cane, single crutch or two crutches to ambulate (Tr. at 14).  Plaintiff's subjective complaints of disabling symptoms are not entirely credible (Tr. at 15).  "The problem of establishing the claimant's residual functional capacity was further confounded by the lack of medical records after late 2011.  The claimant was offered the opportunity to submit supplemental medical evidence, in hopes that her other treating doctors' observations noted any exertional or postural difficulties.  However, no further medical evidence was received." (Tr. at 15).

With this residual functional capacity, plaintiff is unable to perform her past relevant work as a sales clerk, fast food worker, or hospital food service worker (Tr. at 16).

Step five.  Plaintiff is a younger individual, having been 30 years of age at the time of her alleged onset date (Tr. at 16).  Plaintiff is capable of working as a small parts assembler or office helper, both available in significant numbers (Tr. at 17).  Therefore, plaintiff is not disabled (Tr. at 17).

## VI.  NEW EVIDENCE

Plaintiff argues that the Appeals Council erred in failing to consider the new, material evidence submitted by plaintiff.  Plaintiff submitted treatment records from Truman Medical Center dated December 27, 2011, through August 8, 2012; treatment records from Dr. Abraham dated December 12, 2012, through January 21, 2013; and a residual functional capacity questionnaire completed by Dr. Abraham on February 20, 2013.

First I point out that all of the records from Truman Medical Center save one were before the ALJ.  I found only one record which was not a duplicate, and that does not support plaintiff's claim of disability.  On January 31, 2012, plaintiff was seen at her OB/GYN clinic (Tr. at 676).  "Pt has no complaints. . . .  Doing well no problems."

Both of Dr. Abraham's medical records (which, as pointed out above, are exactly the same) pertain to visits with Dr. Abraham after the ALJ's November 30, 2012, decision.

The Appeals Council must evaluate the entire record, including any new and material evidence submitted to it after the ALJ's decision, if that evidence relates to the period on or before the date of the ALJ's decision.  McDade v. Astrue, 720 F.3d 994, 1000 (8th Cir. 2013); Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012); Whitney v. Astrue, 668 F.3d 1004, 1006 (8th Cir. 2012); 20 C.F.R. § 404.970(b).  When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, the court does not evaluate the Appeals Council's decision to deny review, but rather determines whether the record as a whole, including the

Case 4:14-cv-00136-REL   Document 18   Filed 02/23/15   Page 26 of 36

new evidence, supports the ALJ's determination. McDade v. Astrue, 720 F.3d at 1000; Perks v. Astrue, 687 F.3d at 1093; Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).

To be new, evidence must be more than merely cumulative of other evidence in the record. Perks v. Astrue, 687 F.3d at 1093; Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). To be material, evidence must be "relevant to claimant's condition for the time period for which benefits were denied." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008); Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).

Plaintiff argues that the ALJ commented three different times in his decision that the lack of treatment records after 2011 made it impossible to find that plaintiff's medical impairments met the requirements of any listed impairment and made it difficult to assess plaintiff's ongoing residual functional capacity.

> Ultimately, the ALJ found Ms. Fleming not disabled due in great part to a lack of medical evidence after 2011. Given that the evidence submitted to the Appeals Council directly addressed the ALJ's concerns as to Ms. Fleming's ability to effectively ambulate, as well as her ability to sit, stand, walk, crouch, crawl, climb, lift, carry, attend to tasks and concentrate, the Appeals Council finding that this evidence would not have changed the ALJ's decision is not supported by the facts.

(plaintiff's brief at p. 27).

The transcript of the administrative hearing establishes that the ALJ was concerned about there being no medical records dealing with plaintiff's orthopedic condition after November 2011:

> Q.      [T]he hearing was postponed because there wasn't sufficient medical records. In fact there were records to I think a year and a half ago. Do you have current medical records now?
>
> A.      No. At that hearing I requested that the Judge obtain my medical records for me and she said that that was something that she would do.
>
> Q.      Well where have you been in the last year? For medical appointments or treatment?

A.     Okay. At first started out at St. Joseph Medical Center, that's where both surgical procedures were --

Q.     Well I know all that information, I'm just wondering -- curious about since you completed the physical therapy on June 24th of 2011, what are you doing four months later, what happened?

A.     . . . I was supposed to be having a third surgical procedure that was to take place November 8th of 2011 and at the time found out that I was pregnant. I was a high-risk pregnancy so they put the surgery off until six weeks after my baby was born and I am currently awaiting that third surgical procedure.

Q.     Where are the medical records? . . .

A.     I am currently on Workers' Compensation, I still receive compensation weekly. I am awaiting the third surgical procedure, which is a knee arthroscopy, which is a surgery for them to determine how long -- . . . I have not been medically released from the, from the orthopedic surgeon. . . .

Q.     And have you seen an orthopedic surgeon at all since November of 2011?

A.     No.

(Tr. at 45-48).

This hearing took place on November 7, 2012. Therefore, plaintiff testified that she had not seen an orthopedic surgeon at all in the previous year. The issue was not that medical records existed but had not been obtained. The issue was that no medical records existed for that time because plaintiff had not sought any treatment during that time.

Twelve days after the ALJ found plaintiff not disabled, she visited Dr. Abraham for the first time in 13 months. These records, dated December 12, 2012, include the following: "Her pain really has been essentially the same for the past year. She does take ibuprofen on a PRN [as needed] basis for this." The medical records dated January 21, 2013, include the very same introduction: "Her pain really has been essentially the same for the past year. She does take ibuprofen on a PRN basis for this." As a result, it is clear that the Appeals Council did not err in finding that these records would not have changed the ALJ's decision.

The final record is the residual functional capacity questionnaire completed by Dr. Abraham on February 20, 2013. Dr. Abraham's opinion, compared to the residual functional capacity as assessed by the ALJ, is not significantly different. Both found that plaintiff would need an at-will sit/stand/walk option. Both found that she could only occasionally stoop or climb stairs, both found that she should never climb ladders, both found that she would need a cane or crutch for ambulation assistance. Dr. Abraham found that plaintiff would need to take unscheduled breaks twice a day for ten minutes, but that she does not need to elevate her leg as she testified. He found that she is likely to miss an average of 2 days of work per month due to her symptoms or treatment. And he found that during a typical workday plaintiff's pain is severe enough to interfere occasionally (or 1/3 of the workday) with the attention and concentration needed to perform "even simple work tasks."

Dr. Abraham's form does not explain why plaintiff could not take two ten-minute scheduled breaks per day rather than unscheduled. There is no mention in any treatment records of a need to take unscheduled breaks from any activity. Despite his finding that plaintiff would likely miss two days of work per month due to her symptoms and treatment, the record establishes that she was able to go 13 months with no treatment whatsoever for her knee, and that her only treatment during that time was occasional use of over-the-counter ibuprofen. This also calls into doubt the finding that plaintiff's pain is severe enough to interfere with the attention and concentration needed to perform even simple work tasks during 1/3 of the workday. Finally, I note that although Dr. Abraham made these restrictive findings in this form and indicated that plaintiff's condition had been this way since June of 2010 when she first injured her knee, he had previously released her to return to work, which is inconsistent with his February 2013 findings in the residual functional capacity questionnaire.

Because I find that the record as a whole, including the new evidence, supports the ALJ's determination, plaintiff's motion for summary judgment on this basis will be denied.

## VII.    *LISTING § 1.02*

Plaintiff argues that the ALJ erred in finding that plaintiff's impairments do not meet or equal listing § 1.02. "In the present case, the instability, chronic pain, limited range of motion and joint space narrowing of Ms. Fleming's left knee meets the requirements of listing § 1.02." (plaintiff's brief at p. 23).

To meet listing § 1.02(A), plaintiff has the burden of establishing:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation,[12] contracture,[13] bony or fibrous ankylosis,[14] instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.02.

Additionally, plaintiff must show the above-defined dysfunction with "involvement of one major peripheral weight-bearing joint (e.g., hip, knee, or ankle), resulting in inability to ambulate effectively." Id. The inability to ambulate effectively is defined as:

[A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower

---

[12]Subluxation is a dislocation. In the knee it is typically a dislocated knee cap.

[13]A contracture develops when the normally stretchy tissues are replaced by nonstretchy fiber-like tissue. This tissue makes it hard to stretch the area and prevents normal movement. Contractures mostly occur in the skin, the tissues underneath, and the muscles, tendons, ligaments, and joint areas. They affect range of motion and function in a certain body part. There is usually also pain. A flexion contracture of the knee is the inability to fully straighten the knee.

[14]Bony ankylosis is a union of the bones of a joint by proliferation of bone cells resulting in complete immobility. Fibrous ankylosis is reduced joint mobility due to proliferation of fibrous tissue.

extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

(2)     To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include . . . the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.00(B)(2)(b).

The ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, subpt. P, Appendix 1 (Tr. at 13). In support of this finding, the ALJ stated as follows:

The claimant's tibial plateau fracture was evaluated with reference to listed impairments 1.02, . . . 1.03, . . . and 1.06. . . .

To meet any one of these listings, the medical evidence must establish that the claimant's injury resulted in the inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur within 12 months of onset. . . .

The ability to ambulate fluctuated in the months following surgery. In January 2011, the claimant presented to her orthopedic surgeon, using a cane for ambulation assistance. At which time, the claimant reported that she could go an hour to an hour and a half without her cane. However, the claimant's hardware infection [resulted in] additional knee surgery in March 2011.

In July 2011, the claimant was noted to be "using a cane for ambulation assistance." At her August 4, 2011 office visit the claimant reported to Scott Abraham, M.D., her orthopedic surgeon that she was "still using one crutch for ambulation." In September 2011, she reported to Dr. Abraham that she was only able to be on her legs about two hours at a time, and continued to need at least one crutch and sometime[s] two.

Stanley Bowling, M.D., an orthopedist, noted in October 2011 that the claimant walked with a crutch, and that she claimed to walk about 10 yards at a time. The absence of subsequent medical records for 2012 rendered it difficult to determine the severity of

Case 4:14-cv-00136-REL   Document 18   Filed 02/23/15   Page 31 of 36

the claimant's impairment thereafter.  However, the medical evidence taken as a whole indicated that the claimant had returned to effective ambulation within a few months of her initial surgery.

(Tr. at 13-14).

Plaintiff's medical records establish the following with respect to her ability to ambulate:

On June 8, 2010, plaintiff was able to ambulate with a walker and navigate stairs.

On June 18, 2010, Dr. Abraham told plaintiff to use crutches as needed.

On July 8, 2010, plaintiff was non-weight bearing.

On July 15, 2010, plaintiff was non-weight bearing.

On August 30, 2010, plaintiff was non-weight bearing.  "She really needs to work on quad strength."

On September 27, 2010, plaintiff was partial weight bearing and was noted to be using a walker.  Dr. Abraham recommended she progress to weight bearing as tolerated under the supervision of her physical therapist.

On November 8, 2010, plaintiff was using a cane.  Dr. Abraham told plaintiff to wean herself from the cane and if she continued to have trouble doing that, she should participate in a work hardening program.  On this day -- about four months after her surgery -- Dr. Abraham released plaintiff to return to work on light duty.

On December 6, 2010, plaintiff was using a cane.  She was able to walk for 50 minutes without her cane.  Dr. Abraham told plaintiff to continue weaning herself off the cane and recommended work hardening.

By January 3, 2011, plaintiff was able to go 1 hour to 1 1/2 hours without using her cane.

32

On January 31, 2011, plaintiff was weight bearing but used an immobilizer. Plaintiff was not using an assistive device. She reported intermittent swelling with the hours of physical therapy and work hardening she was doing each day. Because by this day plaintiff was able to walk without using a cane or crutches, the 12-month durational requirement of the listing has not been met.

On March 16, 2011, plaintiff continued to be weight bearing but was using a cane for ambulation assistance.

On March 21, 2011, plaintiff had surgery to remove hardware due to a suspected infection. Dr. Abraham indicated that she would have to be non-weight bearing for four to six weeks after this surgery.

On April 4, 2011, plaintiff was non-weight bearing and using a walker for assistance. Dr. Abraham told plaintiff to remain non-weight bearing for the next four weeks.

On May 2, 2011, plaintiff was non-weight bearing and using crutches. Dr. Abraham recommended that plaintiff begin weight bearing as tolerated.

On May 27, 2011, plaintiff was partial weight bearing, still using two crutches, and said she was going to transition to one crutch in about a week.

On June 27, 2011, plaintiff was weight bearing but using crutches. Her physical therapist said plaintiff could only walk 90 feet before the pain was too bad.

On July 13, 2011, plaintiff was weight bearing but using a cane.

On August 4, 2011, plaintiff was using one crutch.

On September 8, 2011, plaintiff said she was only able to be on her leg for two hours at a time and that she continues to need one crutch, sometimes 2.

On October 14, 2011, plaintiff was observed walking with the use of a crutch. X-rays were taken and revealed overall good alignment of the tibial plateau. She had some joint space

narrowing and early degenerative changes.

On November 7, 2011, plaintiff was observed using two crutches. Dr. Abraham recommended arthroscopy to see if there was anything that could be done to relieve her pain.

None of the OB/GYN records, cardiology records, or psychiatry records[15] from December 2011 through fall of 2012 reflect that plaintiff was using a cane or crutches when she went to those appointments. Records dated June 20, 2012, reflect that plaintiff was wearing a knee brace. She reported lower leg edema but said that happens if she is up on her feet too long.

On December 12, 2012, plaintiff was noted to be using a knee brace and two crutches when she saw Dr. Abraham. In February 2013, Dr. Abraham found that plaintiff needs to use a cane.

Summarizing this then, plaintiff was unable to ambulate without the use of a walker or two crutches/canes from her alleged onset date until November 8, 2010 -- about four months. From November 8, 2010, until her second surgery on March 16, 2011, she was able to ambulate without needing a walker, two crutches or two canes and therefore did not meet the listing during that time. Plaintiff needed a walker or two crutches/canes from the date of her second surgery until July 13, 2011, when she needed only one cane. This was a period of

_____

[15]Plaintiff argues that a psychiatric evaluation on June 20, 2012, reflects that she was walking very slowly and using two crutches to ambulate. First, that evaluation occurred on June 15, 2012, not June 20. Second, I note that plaintiff told Dr. Maldonado-Duran that she broke both kneecaps and an ankle in her accident at Home Depot which is not supported by the medical records and is clearly an exaggeration of her physical condition. His record also makes note of her "number of operations in the knees" which again is not an accurate reflection of plaintiff's medical history, as she had surgery on only one knee on two occasions. Therefore, although Dr. Maldonado-Duran observed plaintiff walking slowly and using crutches, she clearly exaggerated her medical history and, because no other medical records from 2012 include an observation that plaintiff was using crutches -- including an OB/GYN record five days later that mentions plaintiff using a knee brace but makes no mention of crutches or a cane -- the credibility of this record with regard to plaintiff's ability to ambulate is called into question.

about four months. Plaintiff was able to ambulate without an assistive device or with one cane or one crutch until November 7, 2011, when she was seen by Dr. Abraham and was using two crutches. Three and a half weeks earlier, however, she had been seen by Dr. Bowling and was able to ambulate on one crutch. During that visit with Dr. Bowling, the joint space narrowing and early degenerative changes had already shown up on plaintiff's x-rays, yet she was able to ambulate with the use of one crutch. Because there was no evidence of a worsening condition between plaintiff's visit with Dr. Bowling and her November 7, 2011, visit with Dr. Abraham, it appears that her decision to use two crutches during the latter visit was her own personal choice and not a requirement in order to ambulate. None of the OB/GYN records reflect that plaintiff used crutches or a cane during any of her visits. On one record dated June 20, 2012, plaintiff was noted to be wearing a knee brace. It is illogical to assume that the doctor would make note of a knee brace but not crutches or a walker. Therefore, the fact that plaintiff used two crutches when she saw a psychiatrist five days earlier is irrelevant since she clearly was able to ambulate without them.

Finally, I point out that plaintiff stated the following during her November 7, 2012, administrative hearing: "[T]hey got me a non-fitted leg brace and I was basically told to be extremely careful over the next nine months and we would proceed with the surgical procedure after I have the child." (Tr. at 50). I find that (1) had plaintiff needed to use crutches during the entire term of her pregnancy she would have said so during this part of the hearing, and (2) even if she had used crutches during that time it would not have been because she medically needed them since she testified that her orthopedic surgeon told her to use a non-fitted leg brace, not crutches or a walker. The most recent medical records pertaining to plaintiff's knee establish that there was no known cause for plaintiff's pain. The surgeon recommended performing an arthroscopy to see if there was any physical abnormality

35

that could be repaired. "We discussed the fact that this will be for **diagnostic arthroscopy** with possible chondroplasty vs. possible microfracture if needed. We also discussed the fact that there may be nothing that we may be able to do arthroscopically for her knee. This certainly is a difficult situation as her bone is healed but she continues to have pain in her knee." (emphasis added). Plaintiff's pain was the reason she chose to use crutches; however, her pain was not severe enough to require any treatment other than occasional over-the-counter ibuprofen. Lastly, I note that plaintiff's orthopedic surgeon stated in February 2013 -- in the residual functional capacity questionnaire that plaintiff urges this court to adopt -- the plaintiff needs only a cane to ambulate.

Plaintiff has not met her burden of establishing a listed impairment.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 23, 2015

Case 4:14-cv-00136-REL   Document 18   Filed 02/23/15   Page 36 of 36